Filed 8/22/14  In re J.R. CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re J.R., a Person Coming Under the Juvenile Court Law. | B253941 (Los Angeles County Super. Ct. No. CK76810) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> ROSARIO A., <br><br> Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

Rosario A. (mother) contends there is insufficient evidence to support the trial court's conclusion that her son was adoptable, and that he would likely be adopted within a reasonable time after termination of parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

J.R., the primary subject of this appeal, was four years old in April 2009 when respondent Department of Children and Family Services (DCFS) filed a Welfare and Institutions Code section 300[1] petition on behalf of him, his half-brother, five-year-old A.A., and infant half-sister, J.M.A. Mother has given birth to three more children since April 2009.[2]

The initial petition essentially alleged: (1) a history of domestic abuse between mother and/or her boyfriend, Anthony D. and the maternal grandmother (grandmother); (2) medical neglect (3) substance abuse; and (4) leaving the children with an inappropriate caregiver, namely grandmother. DCFS became involved after receiving a report that mother had been involved in a car accident and had not had J.M.A. properly restrained in an infant car seat, and had left A.A. and J.R. with grandmother, who was reportedly physically abusive.

In May 2009—after mother emerged from "hiding" with J.M.A.—A.A., J.R. and J.M.A. were placed together in the foster home of M.E. A social worker, familiar with the family's history, said J.R. had been "'a really active child since he was a baby,'" who had been aggressive with and once kicked the social worker. M.E. said J.R. had adjusted to the foster placement without difficulty, but she had concerns about his aggressive behavior toward other children.

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2] A.A.'s father, Jose S., has been deported. J.R.'s father is deceased. J.M.A.'s father, to whom we refer as Anthony D., is also the father of mother's three youngest children. No child's father is a party to this appeal.

On July 29, 2009, the juvenile court sustained the petition, as amended, on behalf of A.A., J.R. and J.M.A. as a result of, among other things, domestic violence between mother and Anthony D., Anthony D.'s substance abuse, having left the children with an inappropriate caretaker and physical abuse by grandmother and Anthony D. At disposition, the children were removed from mother's custody, and reunification services were ordered.

In January 2010, DCFS reported that A.A., J.R. and J.M.A. remained happily placed with and well-cared for by M.E., and got along well with her family members. J.R.'s pre-school teacher described him as an active child who enjoyed playing with his peers, and often needed to be reminded to focus on tasks. He was on a waiting list for counseling services.

In April 2010, all three children were placed in a new foster home with Mr. and Ms. D.M. M.E. refused to continue caring for them after mother made two referrals to the child abuse hotline accusing M.E. of physically abusing the children. The referrals were investigated by DCFS and deemed unfounded.

In late September 2010, mother accused Mr. D.M. of raping and molesting J.M.A. She took the child to the hospital because she believed the girl's vaginal opening was larger than it had been when she first went into foster care. DCFS investigated the allegation. It was deemed unfounded after hospital employees reported that mother had been "out of control" when she brought J.M.A. to the hospital for an assessment, and had screamed at the nurses and doctor after it was determined that there was no evidence of sexual abuse. Because of mother's false accusation of sexual abuse, the D.M.'s asked that the children be removed. They were then placed in separate foster homes. Later, J.R. told Ms. D.M. that mother told him to lie and accuse Ms. D.M. of hitting him so he could go home to mother early.

In October 2010, DCFS informed the court that it was concerned about mother's false allegations against the children's former foster parents, made in order to sabotage their placements and which necessitated new placements for the siblings in separate foster homes. Mother's pattern of making false accusations was part of her ongoing

3

irrational behavior, and a sign that she lacked insight into how her misbehavior sabotaged her children's placements. In October 2010, mother gave birth to her fourth child, a son, A.D.

By mid-November 2010, A.A. and J.R. had been placed in the same foster home of Ms. M., but J.M.A. remained elsewhere. J.R. attended kindergarten, but had ongoing problems at school and on the bus. J.R. was in therapy. His therapist was working to improve his behavior and communication skills.

By mid-December 2010, mother had made sufficient progress in her case plan that the court returned A.A., J.R. and J.M.A. to her custody under a family maintenance plan. Mother's progress was short-lived.

All four children were detained in April 2011 after mother, reportedly pregnant with her fifth child, was observed making disparaging remarks about J.M.A. and engaging in acts of physical aggression against her, which caused the toddler to hit her head against a wall. A.A. and J.R. were placed together in one foster home; J.M.A. and A.D. were each placed in a separate foster home. On May 4, 2011, DCFS filed a section 342 petition on behalf of A.A., J.R. and J.M.A., and a new section 300 petition on behalf of A.D. The children were detained, mother was given monitored visitation, and DCFS was ordered to try to find a single placement for the children.

By mid-September 2011, the petitions had been sustained and all four children were removed from mother's custody. The three boys were placed in one foster home, and J.M.A. in another. Reunification services were ordered. The boys' placement was soon disrupted after mother accused the foster mother of not properly feeding the children. Afraid her license—with which she supported her family—would be revoked because of (what turned out to be) false accusations, the foster parent requested that the boys be placed elsewhere.

In October 2011, mother's fifth child, C.A., was born. DCFS reported that mother was participating in her treatment plan. In November 2011, based on a recommendation from J.R.'s therapist, the court ordered that the child undergo a psychiatric evaluation.[3]

By mid-November 2011, A.A., J.R. and J.M.A. were placed in the foster home of Maria S. Maria S. told DCFS that J.R. showed a marked increase in emotional labiality and aggression following visits with mother. The teachers and psychologist at J.R.'s school also observed that J.R.'s misbehavior increased in the days immediately after spending time with mother. The child's therapist told DCFS that mother sabotaged the placements by doing such things as asking the children, in front of their foster parents, whether they were being beaten or fed. The foster parents became afraid that mother's accusations would affect them, and asked to have the children be replaced. This situation had already occurred three times. J.R. was participating in weekly therapy sessions and his therapist opined that the child would benefit greatly from continued therapy.

On January 31, 2012, DCFS filed a section 300 petition on behalf of newborn C.A. The child was detained, removed from mother's custody and declared a dependent in mid-May 2012. Mother was given monitored visitation and reunification services. Those services were terminated in early April due to mother's failure to comply with the terms of her case plan. Meanwhile, mother was requesting that the boys be moved from Maria S.'s foster home to a relative's home. DCFS believed mother wanted the children moved from Maria S.'s home because the foster mother set boundaries for the children. DCFS observed that mother did not appear to take into consideration the fact that there had been six placements to date, and that such "constant uproot[ing] [was] not healthy for the stability of the children." A report filed by DCFS in September 2012, indicated that J.R. was on target developmentally, and developing age appropriately, although his "behaviors are often difficult." He was being evaluated for Ritalin. J.R.'s school reports

---

[3] The record reflects that evaluation may have been conducted on January 26, 2012, but no further information is available.

reflected "'marked deficits in auditory processing and attention'" and he was often inattentive, hyperactive, distracted and impulsive. In November 2012, J.R. was involuntarily hospitalized under section 5150 following an unspecified incident at school.

In December 2012, mother's reunification services were terminated as to the four oldest children for failure to comply with the case plan, and a section 366.26 hearing was scheduled.

In early January 2013, A.A., J.R. and A.D. had to be removed from Maria S.'s home after she sustained an injury that prevented her from caring for the children. After Maria S. recovered, she requested that all three boys be returned to her care. DCFS, however, was unable to comply with that request because Maria S.'s home was now too small for children of the ages of A.A., J.R. and A.D. Only A.A. and A.D. returned to Maria S.'s care.[4]

In early March 2013, J.R. was placed in the foster home of Debra C., and was reportedly thriving. By mid-March, DCFS had filed an ex parte request (section 385) seeking to limit mother's telephonic contact and visits with J.R. Debra C. had reported to DCFS that mother said inappropriate things to J.R. and, as the assigned monitor, she was forced to intervene. For example, mother called one evening to tell J.R. she was having him moved because Debra C., with whom the child had bonded, was no good for him. The child began to cry, and Debra C. was forced to end the call. The next day, J.R. began to display behavioral problems at school. His therapist opined that he was reacting to mother's statements. Mother requested that J.R. be removed from Debra C.'s home. She accused Debra C. of trying to take J.R. from her, interfering with her conversations with J.R. and being rude. DCFS observed that J.R. had not otherwise experienced any problems since his placement with Debra C., was better behaved and happy in her home

---

[4] Following his replacement from Maria S.'s home, J.R. was hospitalized on two occasions "due to behavioral outbursts." He was referred to two programs through the Department of Mental Health which provided treatment to emotionally or behaviorally challenged youth in a home setting, and prescribed the psychotropic medications Risperdol and Clonidine.

6

and did not want to leave. Debra C. wanted to provide J.R. a permanent home, but was not willing to continue serving as a monitor for mother's visits due to her aggressive tone and demeanor. The court limited mother's monitored visits with J.R. to two per month.

In its initial report for the section 366.26 on April 3, 2013, DCFS reported that Debra C. was "willing to make a lifelong commitment to raising" J.R., and was interested in adopting him "in the near future" but was not yet ready to do so. Debra C. later changed her mind (for undisclosed reasons) and decided not to adopt J.R. or become his guardian. The agency planned to refer the child to be matched with a prospective adoptive family. J.R. remained in therapy. In school his grades had improved, and he earned "mostly B's." The section 366.26 hearing was continued to August 20, 2013.

In May 2013, mother, who had been avoiding contact with DCFS, gave birth to her sixth child, a son, J.A.

In early June 2013, DCFS reported that J.R. remained in Debra C.'s home. He had begun to exhibit behavioral problems at home and at school where he was aggressive and fought with other students and had trouble following directions. J.R. was taking medication for "emotional disorders," and continued to participate in individual counseling, but his behavioral problems escalated. On one occasion he got upset and broke a window in Debra C.'s home. She determined she could no longer care for him, and requested that he be removed. DCFS began looking for an appropriate adoptive placement. DCFS was trying to find a single adoptive home for A.A., J.R. and A.D. but, in the event that effort was unsuccessful, it intended to seek separate adoptive homes for the boys. J.R. was re-placed in a new foster home in which DCFS reported that he was "doing very well."

On July 22, 2013, DCFS filed a section 300 petition on behalf of J.A. At the time, mother was, "at large with minor," but she later contacted law enforcement and the infant was taken into protective custody.

The section 366.26 hearing was continued again to permit DCFS to make additional efforts to locate an adoptive home for A.A., J.R. and A.D. In November 2013, A.A. and A.D., who had remained together, were placed in a potential adoptive home, as

7

were J.M.A. and C.A.  DCFS continued its search for a separate adoptive placement for J.R.

The contested section 366.26 proceedings took place on January 9, 10, 16 and 17, 2014.  DCFS requested that parental rights be terminated as to A.A., J.R., J.M.A., A.D. and C.A.  Even though J.R. did not yet have a prospective adoptive placement, DCFS argued that he was an adoptable child and no exception to the preference for termination of parental rights had been shown.  Mother argued that parental rights should not be terminated, asserting that she had established the beneficial contacts and sibling relationship exceptions.  She claimed that it was "possibl[e]" that J.R. was not adoptable, and asserted that parental rights should not be terminated as to him in the absence of an approved adoption home study.  Children's counsel joined DCFS's request that parental rights be terminated, arguing that mother had attempted to disrupt the children's placements at every turn, and had made accusations against their foster parents throughout the proceedings.

At the conclusion of the hearing, the court found J.R. adoptable and terminated parental rights.  Mother, who had not appeared for the hearing, appeared after the court made its findings.  The court vacated its findings and agreed to permit mother to testify.  After mother's testimony, counsel for DCFS and mother indicated their desire to rely on their earlier closing arguments and the court again found by clear and convincing evidence that the child was adoptable and that mother had failed to establish the applicability of any exception.  Parental rights were terminated.  Mother filed a timely appeal.

## DISCUSSION

Mother contends there is no substantial evidence to support the juvenile court's finding that J.R. was adoptable or that he was likely to be adopted within a reasonable time.  We disagree.

At the stage of a dependency proceeding when it has been determined a child cannot safely be returned to his parent, the overriding concern is the child's interests in permanency and stability.  (§ 366.26, subd. (b); *In re Marilyn H*. (1993) 5 Cal.4th 295,

8

309; *In re Lorenzo C*. (1997) 54 Cal.App.4th 1330, 1344.)  Under section 366.26, subdivision (b), the child must be placed for adoption, in legal guardianship, or in long-term foster care.  The goal is to choose the long-term plan that will most benefit the child. (*In re Jennifer J*. (1992) 8 Cal.App.4th 1080, 1090.)  Adoption, where possible, is the preferred permanent plan.  (*In re Jessie G*. (1997) 58 Cal.App.4th 1, 6.)

Parental rights may be terminated and the child ordered placed for adoption only after the court determines, by clear and convincing evidence, that it is likely the child will be adopted.  (§ 366.26, subd. (c)(1).)  "'The issue of adoptability . . . focuses on the minor, e.g., whether the minor's age, physical condition, and emotional state make it difficult to find a person willing to adopt the minor.  [Citations.] . . . [I]t is not necessary that the minor already be in a potential adoptive home or that there be a proposed adoptive parent "waiting in the wings."  [Citations.]'  [Citation.]"  (*In re Lukas B*. (2000) 79 Cal.App.4th 1145, 1154; *In re Josue G.* (2003) 106 Cal.App.4th 725, 733.)  "'However, there must be convincing evidence of the likelihood that adoption will take place within a reasonable time.  [Citation.]"  (*In re Brian P*. (2002) 99 Cal.App.4th 616, 624.)

We review the court's adoptability finding for substantial evidence.  (*In re Josue G.*, *supra*, 106 Cal.App.4th at p. 732.)  To determine whether the finding will be upheld, we look to see if substantial evidence, contradicted or uncontradicted, supports it. (*In re Heather A*. (1996) 52 Cal.App.4th 183, 193.)  In making this determination, we "'give the court's finding of adoptability the benefit of every reasonable inference and resolve any evidentiary conflicts in favor of affirming.  [Citations.]'"  (*In re I.I.* (2008) 168 Cal.App.4th 857, 869.)  We do not reweigh evidence or exercise independent judgment, but determine only whether the record contains sufficient facts to support the trial court's findings.  (*In re Matthew S*. (1988) 201 Cal.App.3d 315, 321.)  In short, the pertinent question on appeal is whether substantial evidence exists to support the findings the court made, not whether it might have made different findings.  (*In re Dakota H*. (2005) 132 Cal.App.4th 212, 228.)

9

"Usually, the fact that a prospective adoptive parent has expressed interest in adopting the minor is evidence that the minor's age, physical condition, mental state, and other matters relating to the child are not likely to dissuade individuals from adopting the minor. In other words, a prospective adoptive parent's willingness to adopt generally indicates the minor is likely to be adopted within a reasonable time either by the prospective adoptive parent *or by some other family.*" (*In re Sarah M*. (1994) 22 Cal.App.4th 1642, 1649–1650; *In re Jerome D.* (2000) 84 Cal.App.4th 1200, 1205 [evidence of an approved family's willingness to adopt a child of a particular "age, physical condition, and emotional state" can be used to evaluate the likelihood that the child will be adopted].) In this case, DCFS reported that Debra C. expressed an interest in adopting J.R. Assuming she was approved to proceed with an adoption, this fact alone would be minimally sufficient to support the court's determination.

Still, mother argues there is insufficient evidence that J.R. is likely to be adopted. She claims that J.R.'s age (nine) and his emotional and behavioral issues that began to escalate while in Debra C.'s care make it improbable that an adoptive home can be found for him any time soon. She argues that this is particularly true because J.R. is approaching puberty when his "hormones [will] start to kick in," and he "is very likely to be totally out of control." There is, of course, no evidentiary support for this contention. And we, of course, are not free to "interfere with the juvenile court's ruling [regarding a child's adoptability] based on speculation about what 'may' happen." (*In re Jose C.* (2010) 188 Cal.App.4th 147, 159.)

On this record, we find nothing about J.R. that precludes him from being placed with a prospective adoptive family. The child is developmentally considered "on target" and "age-appropriate." In school, seven months after he suffered "marked deficits in auditory processing and attention," his performance improved to the commendable point that he now earns grades of "mostly B's."

Mother is correct that J.R. has moved through multiple foster care placements throughout these proceedings. We agree with DCFS, however, that mother ignores the fact that the need for many of those moves arose largely, perhaps only, because of her

10

persistent efforts to sabotage the child's foster care placements. J.R. had to be removed from at least three foster care placements because mother falsely accused one or more of the children's foster parents of physical or sexual abuse or neglect.

Throughout this action, apart from the latter portion of his time with Debra C., J.R.'s foster parents have described him as an ordinary child who is "happy," exhibits decent behavior, and who gets along and enjoys playing with the foster parents' children. J.R. was reported to engage in "normal mischievous behavior," and to respond well to time-outs as discipline. Indeed, J.R.'s placement with Maria S., one caretaker with whom he and two brothers lived for over a year, went so well the caretaker requested that he be returned to her care after she recovered from the incapacitating injury that necessitated his removal. Notably, while in this placement, both J.R.'s foster mother and his teachers reported a marked change in the child's emotional state and an increase in aggression and misbehavior following his visits with mother. During that period, J.R.'s therapist also reported that mother had made concerted efforts to sabotage the children's foster care placements by making false accusations. This had resulted in several sets of foster parents requesting that the children be replaced for fear of how mother's false accusations would affect them.

Shortly after J.R. moved into Debra C.'s home, DCFS reported J.R. to be happy, well-behaved and thriving, that he and Debra C. had bonded, and that she had expressed a desire to soon adopt him. However, J.R.'s behavior took a turn for the worse after mother again engaged in sabotage, saying inappropriate things to the child and telling him he would be taken from Debra C. who was no good for him. J.R.'s behavioral problems, which his therapist attributed as a reaction to mother's statements, became so pronounced the court was forced to restrict mother to two monitored visits per month. In addition, Debra C. changed her mind and decided she no longer wished to adopt J.R. or to be his legal guardian. DCFS planned to refer J.R. to be matched with a prospective adoptive family. Even after Debra C., the placement where J.R. experienced the most difficulty, he is also reportedly "doing very well," in his current placement.

11

This chain of events illustrates that, notwithstanding his multiple foster care placements, the juvenile court could reasonably conclude that mother's concerted efforts to undermine J.R.'s placements by making unfounded accusations of misconduct against his caretakers has deterred prospective guardians from stepping forward to provide a permanent home for the child. Although he has been afforded little time to settle into any one of them, J.R. has done well in all his foster homes, including his initial few months with Debra C. Throughout this case, J.R.'s misbehavior has been linked closely to his contact with mother and her inappropriate conduct. Apart from behavioral issues that developed toward the end of J.R.'s stay with Debra C., his penultimate foster parent (to our knowledge), and the one who desired, for a time, to adopt him and provide him a permanent home, nothing about J.R. poses an impediment to his being adopted. For this reason, we find mother's comparison of J.R.'s circumstances to those in *In re Asia L.* (2003) 107 Cal.App.4th 498, inapposite. That case involved two children with severe psychological and emotional problems which required a specialized placement unavailable in the county. (*Id.* at p. 512.) That J.R. has coped as well as he has with all the upheaval, and done as well as he has in the care of so many caregivers permits the reasonable inference that a willing adoptive parent will be able to manage his behavior at least as well as other caregivers have done.

We also find no support for mother's contention that there is insufficient evidence that J.R. will be adopted within a reasonable time, because DCFS searched for an adoptive home for J.R. for six months but "had absolutely no luck in finding a prospective adoptive home for him while finding a home for his brothers, [A.A.] and [A.D.]." Initially, DCFS sought one adoptive home for all three boys. The agency was unsuccessful in that endeavor and, in November 2013, proceeded with adoption for J.R.'s brothers, who remained together. The fact that DCFS could not find an adoptive family for all three boys does not render J.R. unadoptable.

Mother is correct that, at nine years old, the Legislature has recognized that J.R. may be considered "difficult to place" for adoption. (§ 366.26, subd. (c)(3); *In re Michael G.* (2012) 203 Cal.App.4th 580, 591.) We also agree that the case is made closer

given J.R.'s history of mental health and emotional problems. Nevertheless, on this record, we cannot conclude that simply because of his age and behavioral problems—the latter of which J.R. continues to address in therapy—that this child who is otherwise healthy, progressing well in school, has largely adapted well in multiple placements, and is developing in an age appropriate manner, is unlikely to be adopted within a reasonable time. J.R. has been in limbo for over five years. He has been in too many foster homes while waiting in vain for mother to address and correct the problems that gave rise to this action. Not only does the child require the stability an adoptive family can provide, the Legislature has stated that adoption, where possible, is the preferred permanent plan. Notwithstanding the absence of a particular prospective adoptive family, the record contains sufficient evidence that J.R. is adoptable. Under these circumstances, we must affirm the order terminating parental rights.

## DISPOSITION

The order terminating parental rights is affirmed.

NOT TO BE PUBLISHED.


JOHNSON, J.


We concur:


ROTHSCHILD, P. J.


MILLER, J.[*]

---

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.